**NORWEST BANK MARION, NATIONAL ASSOCIATION, Plaintiff-Appellee,**

v.

**L T ENTERPRISES, INC., et al., Defendants,**

**Richard D. Raymon, Defendant-Appellant.**

**No. 84–810.**

Court of Appeals of Iowa.

Feb. 26, 1986.

As Amended April 9, 1986.

Peter C. Riley of Tom Riley Law Firm, Cedar Rapids, and Mary K. Hoefer, Cedar Rapids, for defendant-appellant Raymon.

Robert J. Stone and Janice A. Aasgaard of White, Stone, Aasgaard & York, Marion, for plaintiff-appellee.

Considered by DONIELSON, P.J., and HAYDEN and SACKETT, JJ.

DONIELSON, Presiding Judge.

The plaintiff, Norwest Bank, obtained a judgment of foreclosure against a series of successive owners of two apartment buildings. One of the defendants, an individual member of a partnership which once owned

the buildings, has appealed from the judgment of foreclosure. The appellant, Richard Raymon, contends the trial court erred by imposing a personal judgment against him, by dismissing his cross-claims against other defendants, and by directing him to contribute toward the attorney's fees of another defendant. We affirm as modified.

This case basically involves a series of real estate transactions in which the bank loaned money to L T Enterprises to finance the construction of two apartment buildings in Cedar Rapids, Iowa. The bank was granted a mortgage, which made it the mortgagee and L T Enterprises the mortgagor. The following transactions occurred after construction: L T Enterprises sold the buildings on contract to a partnership named Bulldog Equities; Bulldog Equities, in turn, assigned its interest to Raymon, one of its partners who happened to be an attorney; Raymon later resold the buildings on contract to Robert Olson and Reed Hoeppner; Olson then resold his interest on contract to Creek Wood Place Investments.

This case began when the bank provided construction financing to L T Enterprises in the amounts of $90,000 on January 7, 1977, $160,000 on June 2, 1977, and $15,000 on December 20, 1977, and these loans were due on July 3, 1977, December 1, 1977, and August 19, 1978, respectively. L T Enterprises was unable to obtain permanent end financing on these properties and on December 20, 1977, L T Enterprises was given extensions on the first two mortgages to December 7, 1980. At this same time, the bank entered into a mortgage amendment with L T Enterprises which contained a due on sale clause and the third mortgage was also entered. Furthermore, the bank knew that L T Enterprises in August of 1977 sold the mortgaged real estate on contract to Bulldog Equities. The due on sale clause was not effective against Bulldog Equities or Raymon because it was entered into by the bank and L T Enterprises *after* they bought the property on contract.

In February of 1979, after he was assigned Bulldog Equities' interest, Raymon sold the real estate on contract to Olson and Hoeppner. Raymon knew the real estate did not have permanent end financing and that the mortgages would be due before the due dates provided in the sales contract with Olson and Hoeppner. However, Olson and Hoeppner knew the bank had mortgages on the property they were purchasing.

On December 7, 1980, the mortgage was due, yet the bank chose not to foreclose on L T Enterprises. On December 17, 1980, the bank demanded full payment from L T Enterprises. L T Enterprises defaulted and assigned its rights to the bank. Thus, the bank had a chattel mortgage on the property to cover "rents, issues, uses and profits" derived from the property. While the bank and Raymon discussed permanent end financing before December 20th, the bank never committed itself to providing such financing. Instead, Raymon made a monthly payment to the bank on the mortgage debt in January of 1981. The bank applied this payment toward the mortgage.

In February of 1981, the bank informed Raymon it would no longer accept payment on the notes. The bank also returned Raymon's January monthly payment and filed the present foreclosure action on April 14, 1981.

After the mortgage became due in February of 1981 and until July of 1983, Raymon received $53,175 from Olson and Hoeppner pursuant to the contract. Upon learning that the payments were not being applied against the mortgage, Olson and Hoeppner ceased making payments in July of 1983.

At trial, the bank's position was that a foreclosure would not bring in sufficient assets to cover the outstanding mortgages so that a personal judgment against Raymon for $53,175 was sought to cover the alleged deficiency, which equalled the payments Raymon received from Olson and Hoeppner. The trial court entered judgment against L T Enterprises on the loan in the amounts of $110,047, $195,693, and

$18,367, respectively, and a $53,175 personal judgment against Raymon. The court, in ordering a personal judgment against Raymon, stated:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED: That if the special execution and sale of the real estate described in the preceding paragraph is not sufficient to satisfy Plaintiff's judgments against L T Enterprises, Inc., then general execution shall issue to Plaintiff's request to enforce the judgment against Richard D. Raymon.

On January 18, 1984, the district court granted a judgment of foreclosure, and Raymon has appealed.

Raymon does not challenge all aspects of the foreclosure decree. However, he contends the trial court erred by imposing a personal judgment against him for $53,175, the amount he allegedly collected in contract payments from persons who bought the properties from him. He argues this personal judgment was not justified by the general principle that a mortgage covers rents, issues, and profits generated by the affected real estate; he states that he did not receive rent, but rather received contract payments for the sale of the affected real estate. He also argues that the bank waived any right to a personal judgment against him by rejecting his proffered monthly payments on the mortgage debt.

Raymon also contends the trial court erred by directing him to contribute $2,400 toward the attorney's fees of another defendant, a subsequent purchaser. The attorney fee award was based on a contractual agreement between Raymon and the subsequent purchaser calling for Raymon to pay litigation expenses incurred by the purchaser in connection with a "due on sale" clause in the purchase agreement. Raymon contends this contractual provision concerning attorney's fees was never triggered because the present litigation has no connection to the due on sale clause.

Finally, Raymon submits that the trial court erred by dismissing his cross-claims seeking specific performance from certain other defendants who were subsequent purchasers of the properties. The cross-claims were dismissed because the court had never entered an order permitting Raymon to amend his pleadings by asserting the cross-claims. Raymon contends the dismissal was erroneous because all parties had notice of the cross-claims and because he had made a proper request to amend his pleadings.

## I.

Because a foreclosure action is an equity proceeding, Iowa Code § 654.1 (1983), our review of the facts is de novo. Iowa R.App.P. 4.

Raymon contends on appeal that the trial court erred in imposing a personal judgment against him because he did not assume the mortgage and the payments he received from Olson and Hoeppner were contract payments, not rent, which the bank was not entitled to under its assignment from L T Enterprises. The mortgage provides that all subsequent possessors took subject to the rents, issues and profits from the real estate. The mortgage did not purport to have a lien on contract payments.

The trial court believed a constructive trust was an appropriate device under these circumstances because to permit Raymon to retain the money would be inequitable towards not only the bank, but also Olson and Hoeppner.

Iowa authority provides:

A constructive test is an appropriate remedy against unjust enrichment, whether initially tainted with fraud or not. [Authorities]. However, in order to establish such a trust, it is necessary that there be a res or specific fund on which the trust may be fixed. [Authority]. [O]ne who seeks to establish such trust must actually identify his property which is the subject of the trust, or other property into which it has passed and that it is actually in the possession of the party sought to be charged. [Authority].

*Homolka v. Drahos*, 247 Iowa 525, 529, 74 N.W.2d 589, 591 (1956). *See also Loschen*

*v. Clark,* 256 Iowa 413, 419, 127 N.W.2d 600, 603 (1964) ("A constructive trust is substantially an appropriate remedy against unjust enrichment. It is raised by equity in respect of property which has been acquired by fraud, or where, although originally without fraud, it is against equity that it should be retained by the person holding it.").

The trial court noted that at some point during the transactions, Raymon became unjustly enriched. The trial court arrived at this conclusion because the record indicated that Olson and Hoeppner knew the bank held a mortgage on the property and when they realized their payments to Raymon were not being forwarded to the bank to reduce the mortgage, they ceased paying Raymon.

It is generally held that: "An agreement, to constitute a contract of assumption of a mortgage debt by a grantee of the mortgaged premises, must clearly import that the grantee in fact assumes the payment of the debt." 55 Am.Jur. 24 Mortgages § 1097A at 889. Iowa law also provides that:

> [A] purchaser of mortgaged land who buys it subject to the mortgage does not incur a personal obligation to the mortgagee to pay the mortgage without additional language showing an assumption of the debt or a covenant to pay it.

*Fye v. Cox,* 263 N.W.2d 725, 727 (Iowa 1978). None of the uniform sales contracts entered into in this case mentioned that the purchasers "assumed" the mortgage.

■ Our problem with the imposition of a constructive trust on Raymon is that the bank chose the remedy of foreclosure, which means it could only look to the property to satisfy its debts or to a personal judgment against the mortgagor. Throughout this series of transactions, the bank and L T Enterprises remained in a mortgagee-mortgagor relationship. The transactions between L T Enterprises, Bulldog Equities, Raymon, and Olson and Hoeppner, were all based on sales contracts with no mention that any of these parties were assuming the mortgage. Thus, because the mortgage was not assumed, the consequence of these transactions was that all the parties who entered into sales contracts, including Raymon, Olson, and Hoeppner, could lose no more than that property itself, and no personal judgment could be levied against them. The only party the bank could look to for recovery beyond the value of the property was L T Enterprises. Upon the failure of L T Enterprises to make the mortgage payments, the bank could have foreclosed, but instead accepted one payment on the mortgage directly from Raymon. During the period where the bank would not accept payment from Raymon, he received $53,175 from Olson and Hoeppner pursuant to their sales contract. It is hard to fault Raymon because he demonstrated a willingness to pay the bank, but the bank chose to enforce the due on sale clause two months after L T Enterprises did not make required payment in December of 1980.

■ While Olson and Hoeppner could have sought to impose such a trust on Raymon, we cannot see why the bank should benefit from Olson and Hoeppner's loss. We disagree with the trial court because we do not understand why it is inequitable towards the bank for Raymon to retain the funds. The bank chose its remedy and must deal with the consequences. Olson and Hoeppner have already lost the property and having Raymon pay the bank with their $53,175 would not benefit them in any way. This is not to be construed as our approving of Raymon's handling of the funds, but only as our belief that the bank in choosing to foreclose was not in a position to impose a constructive trust on Raymon when no benefit to Olson and Hoeppner would result. We express no opinion as to the liability of Raymon to Olson and Hoeppner.

We find the trial court erred by entering a personal judgment against Raymon and vacate the personal judgment. Because of our disposition of the personal judgment imposed by the trial court, we do not need to address the affirmative defense issues of waiver and merger raised by Raymon.

## II.

■ Raymon further claims attorney fees should not have been awarded against him pursuant to the guaranty agreement with Olson. The trial court found that even though the bank's foreclosure was not based on the due on sale clause, that Raymon, as guarantor, entered into an agreement with Olson, as beneficiary, that the former would pay expenses incurred by the latter in actions involving the real estate. The terms of the Raymon-Olson agreement reveal that the mortgaged property could not be transferred without the bank's consent and Raymon's offer was accepted by Olson before Raymon was informed of this restriction. After reviewing the disputed terms of the guaranty agreement, we conclude that the agreement covered more than litigation involving the due on sale clause. The agreement expressly states that the beneficiary was concerned about being named in a foreclosure action by the bank. Raymon expressly agreed to pay *all* expenses to Olson in the event the bank foreclosed on the mortgage regarding the alienation of the property. The agreement further provides that Raymon would pay litigation expenses involving losses sustained "for refinancing or otherwise as a result of an action brought" by the bank.

Raymon apparently takes the position that the "or otherwise" language was not to be construed as an insurance-like provision covering any litigation, but rather as relating only to litigation which otherwise arises under the due on sale clause. The agreement does not lend support to Raymon's interpretation. The trial court properly awarded Olson $2,400 in attorney fees.

## III.

The final contention involves the trial court's handling of a cross-claim filed by Raymon. The cross-claim was made in March of 1983 and the trial commenced in November of 1983. Only Olson responded to Raymon's cross-claim. The trial court stated that because the cross-claim was not brought to its attention before trial that it would not enter a motion for leave to amend at trial. Apparently none of the co-parties had actual knowledge, except for Olson, of Raymon's cross-claim. Raymon submits it is appropriate for a trial court to delay trial or postpone a cross-claim filed under Iowa Rule of Civil Procedure 33 for a later date, but no precedent allows a trial court to dismiss a cross-claim because it did not rule on such a claim before trial. We disagree.

■ Raymon claims it is undisputed that all the parties had notice of the cross-claim, yet the trial court ruled that no satisfactory showing was made that the co-parties had actual knowledge of the counterclaim and that prejudice would result to the non-responding parties because they were not prepared to litigate such a claim at trial. Even though the cross-claim was filed in March of 1983, such a claim is not valid against non-responding parties until the trial court grants the motion for leave to amend. *See* Iowa R.Civ.P. 88. ("A party may amend a pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is required and the action has not been placed upon the trial calendar, the party may so amend it at any time within twenty days after it is served. *Otherwise, a party may amend a pleading only by leave of court or by written consent of the adverse party.* Leave to amend, including leave to amend to conform to the proof, shall be freely given when justice so requires." (emphasis added)). No such motion was granted by the trial court. Thus, the cross-claim was denied. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1431 at 169–70 (1971) (Federal Rule 13(g) relating to cross-claims "does not prescribe a time limit within which a party must present his cross-claim. The decision whether to allow a cross-claim that meets the test of subdivision (g) is a matter of judicial discretion. No precise standards have been formulated. Generally, most courts balance the interests of judicial economy and the general policy of avoiding multiple suits relating to the same events

against the possibilities of prejudice or surprise to the other parties and decide the question of timeliness accordingly."). Apparently this matter was not brought to the trial court's attention until the day of trial. While trial courts should liberally grant amendments, *Ackerman v. Lauver*, 242 N.W.2d 342 (Iowa 1976), it was well within the trial court's discretion to deny the motion to amend when it was asked to rule on such motion the day of the trial. *See Moser v. Brown*, 249 N.W.2d 612, 615 (Iowa 1977). The Iowa Supreme Court has stated that:

> The purpose of the leave of court requirement of Rule 88 is to give defendants who have answered a right to object to amendments made which might affect their preparation for trial.... The rights protected under Rule 88 are those of parties who have already joined issue in the case.

*West v. Hawker*, 237 N.W.2d 802, 807 (Iowa 1976). We find no abuse of the trial court's discretion under rule 88 as to the cross-claim filed against the non-responding parties.

■ Raymon's cross-claim for specific performance against Olson was answered on June 9, 1983. Rule 88 provides a party may amend by written consent of the adverse party. The trial court appears to have decided that Olson consented to the cross-claim when he filed his answer in June and thus was prepared to litigate this claim at trial. The trial court on March 27, 1984, enlarged its findings by providing that Raymon could not show merchantable title by a preponderance of the evidence, that Raymon elected compliance or tender of compliance with the contract as his recovery theory, and that Raymon had not met the terms of the Raymon-Olson contract. The trial court then ruled that Raymon failed to show he was entitled to specific performance and denied his claim against Olson. We find no error in the trial court's ruling on the cross-claim.

AFFIRMED AS MODIFIED.